## INDEMNITY INS. CO. OF NORTH AMER-ICA v. ATCHISON, T. & S. F. RY. CO.

### No. 8064.

Circuit Court of Appeals, Ninth Circuit.

Oct. 19, 1936.

Silverthorne & Van Spanckeren, of Phœnix, Ariz., and S. J. Grogan, of Los Angeles, Cal., for appellant.

Chalmers, Fennemore & Nairn, of Phœnix, Ariz., and Norris & Patterson, of Prescott, Ariz., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

DENMAN, Circuit Judge.

With a temerity which strains the indulgence extended to the ardor of losing counsel in their petitions for rehearing, the petition asserts: "There is no evidence in the record that on December 15, 1930, the girders were started in a series of successive transports back and forth between the town of Seligman and the railroad bridge."

There was evidence from which the jury could properly infer that the railway both *contemplated* and subsequently *performed* the complicated transports back and forth from the bridge, interrupting the hoisting of the heavy girders from one side of the bridge, across it, to the other—a transit which was hazardous to its structure and thereby to the continuity of the through and local traffic of its main line tracks, and hence warranting the insistence of the railway's control as .principal over the crane operator as its agent and as a member of the crew of the train and its attendant switchman. The following is evidence that the railway so contemplated:

"By the train crew to operate it, I mean the train crew that had to go down and push the cars of steel out on to the main line and push them on down there to take the crane down and *put the crane in the clear* because there were as high as *thirty or forty train* movements a day on the main line." Slocum, Tr. 81.

"As I remember he told me that the time was such that the switch engine would go down and push the cars in there and *had to stand by all* the time to get *in the clear.*" Slocum, Tr. 81.

"As I remember, they were telling me something about the grape movement *being so many train loads a day* and all that sort of stuff, and due to this they *wouldn't let anybody but their own outfit handle it.*" Slocum, Tr. 87.

That the successive transports between Seligman and the bridge as *contemplated,* were in fact *performed,* the jury could properly infer from the following testimony:

"In regard to the unloading of the steel the crane man operated the crane and the switchman looked after the blocking and outriggers of the crane. They took care of all of that and *told us when to get in the clear if there happened to be another train coming.*" Brown, Tr. 101.

"He had a switchman with him that *watched the track.*" Brown, Tr. 103.

"They work until their day is up *or some train interferes with them* out on the main line like that." Meents, Tr. 124.

"As I remember it, we were unloading the steel for the bridge two or three days. Parts of two days. *They were never out there very long at a time.*" Meents, Tr. 131.

"Neither Mr. Brown, nor any of Mr. Slocum's men, gave any of the train crew who were moving the train *back and forth,* any orders during any of the time that the crane was unloading steel. On the *morning of the 15th* and *again* on the *morning of the 16th* of December, I and the other employees of Slocum knew when to go to

work unloading the steel when we saw the train coming down the track *from Seligman.* * * * The crane operator and his crew and the train crew quit before we quit on the afternoon of the 15th. All *I know is they hooked on to the crane and took it up to the yard at Seligman."* Schofield, Tr. 143.

The bill of exceptions settled the testimony of witness Schofield in the narrative form to read as follows: "Neither Mr. Brown, nor any of Mr. Slocum's men, gave any of the train *crew who were moving the train back and forth,* any orders during any of the time that the crane was unloading steel."

The petition seeks to have us consider this narrative statement as if the bill of exceptions showed it to read that the phrase "back and forth" was a part of the attorney's question and, when so reconstructed, as having a different significance. Counsel should know that such a suggested reconstruction of the record is improper.

The rapid increase in litigation in this circuit, presenting the greatest variety of questions arising from its enormous and diversified terrain, now requires the participancy of each judge in a written opinion every other day of 300 working days. There is no time to waste on the examination or re-examination of the record to disprove contentions improperly raised. Counsel of the ability and professional competence otherwise shown in this appeal have no excuse for the character of certain portions of their petition. The court welcomes and expects a vigorous presentation in petitions for rehearing of contentions of its possible error, but this does not afford a license to maul the record.

The petition cites the case of Baltimore & O. S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189. We are unable to see the applicability of this case. That was a case where through rates had been established by the Commission for an interstate transport between the point of shipment and the point of delivery ultimately intended. It was held that a shipper must pay the full established through rate though he bills his goods to an intermediate point, there paying the scheduled rate thereto, and then completes the carriage by delivery to another intrastate carrier, paying its rate, the combined rate being less than the through rate established by the Commission.

Here there is no through rate established by the Commission past Seligman to the bridge at which the delivery was made. The petition insists that the evidence compels the inference that the carriage through to the bridge was contemplated by the consignee *before* the goods entered into interstate transport. To support this construction the railway asks us to find that the interstate transport of the girders and steel began, not at Roanoke, Va., but at Memphis, Tenn., at a date later than the first discussions of the possible transports from Seligman to the railroad bridge. This would require us to ignore the railway's theory of the case as submitted to the court below, as follows: "The *undisputed* testimony in this case shows that the shipment of steel girders involved in this case was a shipment from *Roanoke, Virginia,* to Seligman, Arizona, and was, therefore, an interstate shipment and as such was received at Seligman subject to the classifications and tariffs in effect at the time the bill of lading was issued. The undisputed testimony shows that *the* bill of lading which was issued in this case was a uniform straight bill of lading and that the shipment was carried in carload lots at carload ratings." Tr. 153.

Counsel should know this cannot be done.

The jury properly could have inferred from the testimony that at a time not shown to have antedated the beginning of the interstate transport at Roanoke, the consignee hoped that he would be able to make this arrangement with the railway and thus avoid the large cost of trucking the heavy girders from the yard in Seligman out to the structure for which they were intended, situated a short distance from the railroad bridge.

Whether or not this hope would be realized was to be determined, at the time of the arrival at Seligman, on the convenience of the railroad and the availability of its crane. The jury was entitled to infer that this determination was not reached until December 12th, when the railroad wrote to the consignee, as follows: "We have had on hand at Seligman for the past two weeks, an Ohio crane of 25 tons capacity which have been holding at that point for unloading the girders consigned to you when received, and *if they arrive within a reasonable time,* am satisfied we shall have the crane available to take care

of the unloading." At that time the flat cars carrying the girders and steel were at Seligman or within a few hours of arrival.

However, the question here is not the intent of the shipper, but whether the through carload rating established by the Commission contemplated the transports back and forth from the bridge after delivery to the consignee at Seligman.

Both the railroad company and the shipper agreed that it did not. They made a bargain based on the road's regulation for the cost of this new and separate service, involving at least a portion of two days, and possibly three days, interrupted employment of a locomotive which, with its engineer and fireman, stood by all the time at the bridge, of the train crew of the flat-cars and, in addition, of a switchman to control the movements on and off the bridge so as to keep the crane, engine, train of cars "in the clear" for main line transportation.

That the railroad contemplated this as a transaction entirely separated from the interstate transport, with its corresponding rate *to* Seligman, is apparent from the statement of its brief on appeal that the evidence "shows an accommodation hiring out of the crane and operator with permission to *use of the appellee's tracks* in order that Slocum might unload this steel." While we hold that this use of the appellee's tracks, crew, engine, and crane was by the appellee railroad itself, we accept the inference from the statement of the brief that this use was something entirely different from that of the transport to Seligman.

We are unable to see how the rendering of this valuable and unusual service in aid of the construction of the State Highway Bridge, rendered at an agreed price, covering the wages of so many men and the use of so many cars, the locomotive, and the locomotive crane, thus avoiding the heavy cost of unloading and transport by truck to the state structure, violates either in intent or effect the provisions of rule 27.

The evidence permits the jury to infer that the transportation was a new and separate service, not covered by the rates referred to in rule 27; and that the railroad properly insisted that the crane operator be one of its crew in the combined transports to and from the bridge with its interrupted and hazardous unloading over the bridge, and that his negligence, if any, was as agent of the railroad.

Petition denied.